Filed 9/18/20  P. v. Cortez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLIE CORTEZ,<br><br>Defendant and Appellant. | F077137<br><br>(Super. Ct. No. MCR053414)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Charlie Cortez was charged with eight counts of a lewd or lascivious act upon a person (A.C.) under the age of 14 by means of force, violence, duress, menace, or fear of bodily injury stemming from his alleged sexual relationship with A.C. (Pen. Code, § 288, subd. (b)(1).)[1] As to six of these counts, defendant was found guilty by jury of the lesser included offense of committing a lewd or lascivious act upon a child under the age of 14 (§ 288, subd. (a)), but was found not guilty of the greater, charged offense (§ 288, subd. (b)(1); counts 1, 2, 3, 4, 7 & 8). The jury was unable to reach a verdict as to counts 5 and 6, a mistrial was declared as to those counts, and they were ultimately dismissed. The trial court sentenced defendant to an aggregate term of 18 years.[2]

On appeal, defendant claims the trial court prejudicially erred when it excluded as irrelevant a small portion of one witness's testimony, and he argues this error deprived him of his federal constitutional right to due process, to a fair trial, and to present a complete defense. The People contend the excluded testimony was irrelevant and was properly excluded, but even to the extent it was improperly excluded, the error did not implicate defendant's constitutional rights and it was harmless under any standard.

We conclude the trial court's ruling was not erroneous. Moreover, even if the trial court erred in precluding the witness from answering one question, any presumed error was not of constitutional dimension, and it was harmless under any standard. Accordingly, we affirm the judgment.

---

[1] Unless otherwise noted, all subsequent statutory references are to the Penal Code.

[2] The court deemed count 1 to be the principal term and sentenced defendant to the upper term of eight years; as subordinate terms, for each of the counts 2, 3, 4, 7, and 8, the court sentenced defendant to one-third of the middle term (six years) for a total of two years per count. (§§ 288, subd. (a), 1170.1, subd. (a).)

## I. Prosecution's Case

A.C. was born in August 1995, and she was 22 years old at the time of trial. She had lived in approximately 23 different foster homes, beginning when she was seven years old, due to her mother's drug addiction. Her relationship with her mother was limited to phone calls, and she did not maintain contact or a relationship with her father.

### A. A.C. Begins Living with the Cortez Family in November 2007

A.C. originally knew defendant and his family from the church they all attended, and defendant's youngest daughter, S., became A.C.'s best friend when they were in the same fourth grade classroom. A.C. would spend weekends with defendant's family about once or twice a month. Although A.C. and S. later attended different schools, they stayed in touch, saw each other at church, and visited on the weekends. S. suggested A.C. move in with her family, which appealed to A.C. because she viewed the family as very loving and wanted to be part of it; the Cortez family indicated to her they wanted to adopt her. Defendant and his wife, L., underwent the process to be eligible to foster A.C. before she was placed with them.

As the Cortez family had expressed an interest in adopting A.C., an adoption study was started by the Department of Social Services (DSS) in October 2007. The adoption specialist assigned to the case, Chandra Bean, assessed the family to ensure they could meet A.C.'s needs, explained the adoption process, and met with A.C. to determine whether she was interested in adoption. Bean continued to work on the adoption process after A.C. moved into the Cortez home in November 2007.

When A.C. moved into the Cortez home during her seventh grade school year, she thought it was perfect. The family's home had three bedrooms, two bathrooms (one of which was in the master bedroom), a living room, dining room, and a kitchen; there was also an above-ground pool in the backyard. A.C. shared a bedroom with S., which was

3.

situated directly across the hall from the master bedroom, and A.C. slept on the top bunk of a bunk bed.  T., S.'s older sister, was already in high school and had her own room.

### 1.	Defendant's Sexual Relationship with A.C. Begins

When A.C. first moved into the house, she felt like defendant was her dad—he treated her the way he treated his own daughters, and there was nothing unusual about the relationship with him.  After approximately two months, however, the relationship between A.C. and defendant became sexual.  The relationship developed in stages, starting with a hug, and then moved to a kiss.  The first time they kissed "inappropriately," they were in the living room on the couch, and he had asked her whether she was thankful that he was adopting her.  When she responded that she was, defendant asked her to show him the extent of her gratitude.  When she approached to give him a hug, he suggested she kiss him on the lips, which she did, and then A.C. went to bed.

Over the first month or two, when no one else was around, he would rub her back while they were watching TV or in the car; he would suggest she lay her head in his lap when she was tired.  He would send her phone text messages that she looked sexy, that she looked good in her clothes, or that he wanted to rub against her.  When A.C. heard things like that, she felt loved and thought it was a good thing.

After approximately two months, when she was 12 years old, A.C. and defendant were watching television in the evening; the rest of the family were in their respective bedrooms.  A.C. was on one couch and defendant was lying on another, and he asked A.C. to lie with him on the couch.  When she complied with the request, he began touching her, including her vagina, some of her clothes came off, his pants were down, and they engaged in sexual intercourse on the couch and floor in the living room.  After defendant ejaculated, A.C. went to the bathroom, and then went to sleep; the next morning when they saw each other, everything was "normal."

4.

A.C. started to fall in love with defendant after the sexual relationship began; he would text her throughout the day while she was at school to say that he missed her. They started having sex multiple times a week after the first time. They had sex in multiple rooms throughout the house, including the living room, the master bedroom, the laundry room, in the backyard pool, and in his truck. On other occasions, they would not have vaginal intercourse, but defendant would touch her vagina. Sometimes defendant would be gone on various job assignments he worked as a handyman, and he would agree she could come with him when she asked. At one particular house where he worked, they had sex in the house while the owner was gone, which happened on more than 10 occasions at that location.

A.C. described multiple occurrences when she gave defendant oral sex in different rooms in the Cortez house, including the master bedroom. Once, when defendant's wife was away for the weekend, defendant woke A.C. from sleep by shaking her foot while she was in bed, and she left her room and went to his bed where they had sexual intercourse. On another occasion during an afternoon, they showered together while L. was gone; although defendant was nervous L. would come home during the interlude, they had intercourse in the shower.

They also had sexual intercourse in the laundry room on many occasions, including while everyone was home, either during the day or at night. Defendant would usually text her to go to the laundry room and get ready, which she knew meant for her to wait in the laundry room with her pants down and her hands on the washing machine while facing it. When defendant would enter the room, they would have intercourse quickly to avoid being caught. The laundry room was near both S.'s and T.'s bedrooms, and it had two doors—one which led to the garage and the other opened into the hallway.

Often, A.C. would either stay up late, or defendant would wake her up, and they would have sex in the living room while everyone else in the home slept. They tried to remain quiet so that they would not wake anyone. A.C. indicated T.'s bedroom door

opened to the living room, but A.C. never remembered that door being open when she and defendant were having sex; she remembered everyone in the house had their bedroom doors closed while they slept. A.C. also admitted the bunk bed she slept on was made of wood and could creak when she climbed out of it. A.C. reported she had no specific bedtime, and most nights the family did not go to bed at the same time.

Defendant and A.C. also had sexual intercourse outside in the backyard, in the pool, and once in the hallway near the bedrooms when everyone else was outside in the backyard swimming. A.C. acknowledged, however, there were houses behind the Cortez house, and cars drove by the front of the house.

A.C. also had sex with defendant in his truck repeatedly. Often A.C. would be on her hands and knees in the passenger seat and appellant would be positioned behind her during intercourse. They had sex in different positions in the truck, and sometimes A.C. would perform oral sex on defendant. In the family car, defendant would touch A.C.'s vagina or have her perform oral sex on him while he drove.

Between 2007 and 2010, there was never a break lasting longer than two months in which A.C. and defendant did not have sex, but A.C. acknowledged she did not know if defendant was circumcised. A.C. never refused to have sex with him because she loved him, and he told her they were going to get married when she was 18. A.C. was very confused by all of it. On occasions, if he became irritated with her, he would tell her he was going to have sex with his wife rather than A.C. because he did not like the way she acted that day; on another occasion when A.C. had a crush on a boy at school, defendant saw her talking to this boy at school and gave A.C. dirty looks.

While A.C. lived at the Cortez home, she was involved in multiple sports, many after school activities, and maintained good grades. She met with social workers regularly, but never complained about defendant; one of the observing social workers noted A.C. seemed to enjoy living at the home, and during 2008 none of the family expressed any concerns about the living situation.

## 2. Problems Arise in the Household

As time progressed, A.C. felt as though L. had discovered A.C. and defendant were having a sexual relationship. L. would become angry when A.C. would ask to go with defendant to any of his job sites, telling A.C. that she was spending too much time with defendant. At some point, L. caught A.C. lying on top of defendant on the couch after they had fallen asleep together. L. questioned why A.C. was not in her bed, and directed A.C. to go to her bedroom. A.C. did not hear what was said between defendant and L. after A.C. left the room.

After that incident and in the preceding months before A.C. moved out, A.C. felt tension in the household worsened. L. was treating A.C. differently than her two daughters, she was angry, forced A.C. to wear clothing that was too big for her, and would not let A.C. wear makeup. Defendant attempted to defend A.C. with L., but it did not have any real effect. A.C. felt the relationship between her and defendant was affecting A.C.'s relationship with everyone in the house.

A.C. began experiencing panic attacks that would cause her to pass out, her heart would beat very fast, and on one occasion in June 2009 she remembered going to the hospital to address the issue. Both defendant and L. went along to the hospital, and A.C. was admitted for one night. The adoption specialist, Bean, spoke with defendant by phone while at the hospital with A.C., and defendant indicated A.C. had been having these "spells" since February 2009.

In July 2009, A.C. called her social worker and asked to be removed from the Cortez home—A.C. reported that she was disrupting the family and no longer wanted to be with them. However, when the social worker visited the home in December 2009, A.C. said she was happy and wanted to be adopted, and the family indicated they were willing to have A.C. stay at the home.

7.

At some point later, L. contacted Bean and informed her that L. and defendant were having marital problems; Bean determined it was inappropriate to move forward with the adoption assessment at that time.

A.C. and L. ended up involved in a physical altercation when L. started punching A.C. Defendant broke up the fight and A.C. fled to a park. A.C. called her social worker, O.J. Devincenzi, and asked to leave the Cortez home because she and L. were not getting along. Defendant also called the social worker that day, January 22, 2010, and confirmed A.C. and L. had been having problems for several months because A.C. did not want L. to tell her what to do. He reported A.C. had gone to a park, and defendant would take her to a family friend where A.C. could stay. Defendant told Devincenzi that A.C. could not come back to the Cortez home.

## B. A.C. Placed in a New Foster Home in January 2010

On January 28, 2010, Devincenzi and Bean met, and Bean told Devincenzi that L. had indicated A.C. should not return to the Cortez home; A.C. was moved by defendant to the home of Dawn and Marcus Hilterbrand.[3] A.C. was 14 years old at that time, in her ninth grade school year.

### 1. A.C. and Defendant Continue Contact

After leaving the Cortez house, A.C. continued to stay in contact with defendant by cellphone and text messages. They were also friends on Facebook—defendant had an account under the name Carlos. A.C. also saw defendant in person, but they did not maintain a sexual relationship. She was trying to ignore him, but he would drive by the road where she lived with the Hilterbrands and would park at a stop sign while pretending to read a newspaper to cover his face.

---

[3]     Because these witnesses share a last name, they are referred to by first name, or collectively as the Hilterbrands.

8.

When A.C. moved to the Hilterbrands, she had a lot of mood swings, which Dawn considered fairly standard for a 14- or 15-year-old. Initially, A.C. had phone calls with defendant, but nothing seemed awkward to Dawn at that point. Dawn was aware of the calls because A.C. did not have a cellphone at the time, and defendant would call the Hilterbrands' home phone, identify himself, and ask to speak to A.C.

In February 2010, about a month after A.C. left the Cortez home, Dawn and Marcus were out of town, and defendant picked A.C. up at her friend's house to bring her back to Dawn and Marcus's house. Defendant and A.C. began arguing in the car because she had been smoking marijuana with her friend, and he told her neither he nor God approved of her actions and that he would disown her and she would never be able to have a family if she continued to act that way. A.C. then decided to kill herself by jumping out of the moving vehicle. After she jumped out of the vehicle, she was injured and defendant took her to the hospital. A.C.'s social worker also came to the hospital; the social worker noted defendant and his wife were there, but something in the way defendant was comforting A.C. did not seem right, and A.C.'s behavior also concerned the social worker—A.C. wanted defendant to stay with her and not to leave, while defendant's wife seemed distant and did not come near A.C. The social worker acknowledged she had not noted these observations in her report, but she had relayed these observations to the district attorney's investigator when she was interviewed in 2017.

A.C. had arranged with Dawn to be driven to church by her friend on the morning A.C. jumped out of the car, but instead, Dawn received a call while they were in church that A.C. was at the hospital. When Dawn arrived at the hospital, she noted that defendant was not there, but L. and one of her daughters were present. Dawn did not know what had happened, and when she asked A.C. what happened, the story did not fit or make sense.

9.

A.C. was subsequently given a cellphone, and Dawn noted there were frequent calls from defendant that would show up on the phone account invoice. In June 2010, when the Hilterbrand family, along with A.C., drove together to Colorado for a vacation, they were in the car for three days, and defendant called at least 25 times. Dawn was concerned about the phone calls because after some of them A.C. would cry for hours on end. Dawn admitted she never heard a phone conversation, only how A.C. would act after the conversations. Specifically, A.C. would receive a call, A.C. would not answer, and then Dawn would see A.C. texting, and A.C. would end up crying frequently. Dawn knew A.C. was texting defendant based on the phone account invoice and also because she could look at A.C.'s phone; also, A.C. acknowledged it was defendant who was calling her. She and Marcus tried to explained to A.C. there was no reason to talk to someone who was making her that upset.

At some point in 2010, while she was living with the Hilterbrands, defendant sent A.C. a text message saying he missed her and that he wished she could come back to the house and they could all be a family again. At some point, they met at a mall, and he gave her a ring. Defendant told her the ring meant that she was his, that she should not have other boyfriends, and that they were going to get married when she was 18. He later showed up at Marcus and Dawn's house and wanted the ring back; she gave it to him, and he told her later that he had buried it.

Dawn recalled an event when A.C. went to spend a night with her biological mother, and defendant called Dawn to tell her that A.C. and he had argued, that A.C. was going to meet a boy at a park, and he did not think that was okay. Dawn tried to call A.C., but received no answer; Dawn drove to the park and found A.C. there alone; A.C. said she told defendant she was meeting a boy to upset defendant. Dawn found the incident peculiar, and she characterized defendant's behavior as jealous.

Dawn remembered defendant calling A.C. frequently, and A.C. would either be on a low or a high after the call, which affected the entire household. In one instance when

defendant had called to talk to A.C., Dawn got on the phone and told him it was not good for A.C. to talk with him and that he and A.C. should take a break from talking to each other. Defendant acknowledged Dawn was correct and that he was sorry. Dawn also recalled at least one occasion where defendant called Dawn to tell her A.C. was calling him too much, and that it was turning his life upside down and causing problems at his house. Dawn also received a call from DSS, indicating defendant had called DSS to request that Dawn ensure A.C. no longer be permitted to call defendant.

Social worker Devincenzi received a call from defendant in May 2010 inquiring how A.C. was doing and asking if his family could celebrate A.C.'s birthday with her in August. Devincenzi said she would speak to A.C. about it. Devincenzi met with A.C. on the same date, informed A.C. of the call from defendant, and Dawn reported to Devincenzi that A.C. was doing well. On June 25, 2010, defendant came to Devincenzi's office because he was in the area for a funeral and wanted to provide his new address. Defendant indicated to Devincenzi that A.C. had been calling and texting him; Devincenzi marked in her case notes that both A.C. and defendant had been complaining they did not want to communicate with each other. Devincenzi told defendant that he was the adult and need not answer A.C.'s calls or texts.

In the 10 or 11 months that A.C. lived with the Hilterbrands, Dawn believed there was never a month in that time that defendant and A.C. did not contact each other. Many calls A.C. received would come from a blocked number; Dawn took the phone away from A.C. at one point and kept it in her own room, and the phone would sometimes ring at 2:00 a.m. When Dawn picked up the phone and answered the calls, sometimes music would be playing and she was unsure who the call was from. After about a week of keeping the phone, Dawn answered a call and heard a man's voice she could not identify say, "'I miss the way you suck my dick.'" Another time when Dawn picked up the phone when it rang, a male caller said "'I love you,'" but when Dawn responded the caller hung up.

11.

Dawn and Marcus changed the number on A.C.'s phone, but a few weeks later text messages started again. The contact name on the messages was not defendant, but Dawn matched the incoming phone number to one she had previously associated with defendant. The text messages said things like "'I miss you'" and "'I love you.'" Dawn and Marcus took the phone away from A.C. again, and Dawn instructed A.C. to tell defendant that it was done and that she was losing her phone privileges again. There were no further messages because A.C. never got that phone back from Dawn. It was not long after they took the phone the second time that A.C. revealed the extent of her relationship with defendant.

At some point after they took A.C.'s phone for the final time, Dawn's daughter again informed her that A.C. had contacted defendant on Facebook. When Dawn checked A.C.'s Facebook account, there were messages with another person under the name of Carlos Falcon. Dawn messaged the person named Carlos Falcon, impersonating A.C. She wrote that she missed him, that she loved him, and that she missed when he made love to her; the person named Carlos Falcon would respond that he missed her and the sex, too. In messaging with Carlos Falcon, Dawn referenced things defendant knew about, such as his wife L., and he responded as though he understood her references.

Marcus also communicated directly with defendant that he was to stop calling and texting A.C. Marcus felt their communications were inappropriate and that after they would talk, A.C. would be in her room crying and he and Dawn would have to console her. During the first call Marcus placed to defendant, Marcus tried to be polite and asked that defendant not call to ensure a better transition for A.C. into Dawn and Marcus's household; defendant did not think the calls were a "big deal," and explained he was just checking on A.C. to see how she was doing.

A few weeks after the initial phone call between Marcus and defendant, Marcus called a second time. Marcus had hoped things were going to calm down after his first phone call to defendant, but the calls between A.C. and defendant had grown even more

12.

frequent. Marcus was more firm in his second phone call to defendant, and Marcus told defendant that he had crossed a boundary line and it was inappropriate. Marcus told defendant to stop calling or texting A.C. Defendant explained that A.C. would say "'mean'" things to defendant, and that defendant had to respond; defendant told Marcus that if A.C. treated Marcus as she was treating defendant, Marcus would respond the same way. Marcus told defendant that he, Marcus, would not be calling a 14-year-old girl because she said mean things—Marcus told defendant that was an inappropriate response inasmuch as defendant was the adult, and A.C. was 14 years old. Defendant explained the whole Cortez family cared about A.C., they wanted her to be okay, and, at some point, defendant started crying and said he wished things were different or better. Marcus was unsure how he was supposed to respond, and Marcus felt badly for defendant.

After this second phone call, Marcus saw defendant at a store, which Marcus described as awkward. Marcus had two small, crying children with him, so he was trying to quickly obtain what he needed and leave. Defendant kept attempting to talk about A.C., hoping she was doing well, and trying to give Marcus pointers about what she should not eat and how to parent her. Marcus kept trying to leave with the children, but felt as though defendant was trying to control the situation and the conversation. Defendant continued to talk to Marcus while following him through the store, even though Marcus was trying to end the conversation. Marcus finally broke off the conversation and left.

A couple of weeks later, Marcus had a third and final phone call with defendant. A.C. was on the telephone while in her room; occasionally, Marcus and Dawn would check the phone while she was talking on it. A.C. gave Marcus the phone when he asked for it, and he discovered she was talking to defendant. Marcus became upset and spoke with defendant over the phone, telling defendant that his communication with A.C. needed to stop. Defendant started crying again and telling Marcus that he, defendant, had

not been calling A.C.—she had been calling him. Marcus confronted defendant about that statement because Marcus could see the call log on A.C.'s phone and the incoming calls from defendant. Marcus explained to defendant that defendant had been calling over and over for months and it needed to stop. Marcus heard some commotion on defendant's end of the line, and defendant told Marcus to tell defendant's wife that defendant had not been calling A.C. Marcus heard defendant's wife, L., shouting on the other end of the line; L. got on the phone with Marcus and Marcus told her defendant was calling A.C. all the time, and that Marcus had asked him to stop over and over; he also told L. that defendant texts A.C. all the time, and that was a problem, too. Marcus described L. as being upset, and she hung up on him.

After the third phone call, Marcus had no further phone or personal contact with defendant, and things had seemed to settle down. However, on a Sunday in September 2010, A.C. was baptized; Marcus and Dawn had a party at the house, and A.C. began acting strangely. A.C. told Marcus that she had thought after she was baptized, things would be different and the "'[n]egative feelings and stuff'" would go away. Marcus thought she meant that only generally, but A.C. then confessed defendant had been her boyfriend and they had had a sexual relationship. Right after she told them this, A.C. fell to the floor sobbing; when Marcus attempted to console her, A.C. jumped up and ran outside; they found her with the help of the neighbors. When A.C. was brought back to the house, she was more upset and defiant about her relationship with defendant. She asked them not to report him or say anything, as A.C. was concerned about defendant's welfare and that he might be hurt. Marcus and Dawn ended the conversation with A.C. by agreeing that everyone would go to bed, and they would figure out what to do in the morning.

Dawn subsequently called Child Protective Services (CPS) and a social worker, Janie Leal, visited A.C. the next day at school. A.C. informed Leal she had no idea why Leal wanted to speak with her; A.C. reported she had been at the Hilterbrand home for 9

14.

or 10 months and she got along well with the family. Leal asked about A.C.'s prior placement, and A.C. was quiet and then said she had lived with the Cortez family for about three years, it had its ups and downs, but she left because she and L. had gotten into a fight. A.C. said she was not allowed to talk to defendant, but she would not say why. A.C. told Leal she had spoken to defendant the prior evening, but she refused to talk further about it and became defensive. Leal asked A.C. if the allegations about A.C.'s relationship with defendant were true, but A.C. refused to talk about it and said it was in the past. A.C. denied that defendant had molested her, and when Leal asked whether the relationship had been consensual, A.C. refused to talk further with Leal.

Later that day, when Dawn and Marcus came to pick up A.C. after school, she refused to get in the car with them and ran off. A police officer reported to the scene, and Marcus told the officer he had seen A.C. walking down the street with her bags. Marcus did not talk to the officer about A.C.'s relationship with defendant. He believed Dawn had already made that report. A.C. did not return to the Hilterbrand home; she was placed elsewhere.

### C. Police Investigation in September 2010

After contacting CPS, Dawn also contacted the sheriff's department to report the sexual relationship between A.C. and defendant. She copied the Facebook messages where Dawn had impersonated A.C. and gave those to the sheriff's department. There was also a cellphone account, but she did not give the call log in that account to law enforcement, nor did she report any details about the Colorado trip.

Sergeant Mark Trukki investigated based on a report by CPS, and he met with A.C. on September 28, 2010. A.C. refused to answer Trukki's questions and said that she did not want to make a statement. Trukki had a phone conversation with Dawn, who told him there were Facebook messages between A.C. and defendant, but Dawn never provided any physical evidence of those messages to Trukki. Trukki looked up the Carlos Falcon account, but there was no picture of defendant associated with that profile.

Trukki called Facebook to place a hold on the account, but he never got further into the investigation because of a lack of cooperation from A.C. At Trukki's request, defendant agreed to an interview, and he denied having a Facebook account profile under the name Carlos Falcon. Defendant appeared angry to Trukki, and walked out of the interview. Trukki said the case could not proceed because A.C. would not make a statement. Trukki did not investigate further who was associated with the Carlos Falcon Facebook profile.

### D. Two Additional Encounters with Defendant and L.

At some point in 2010, A.C. went to the Cortez house to get her dog. She saw L., who said to A.C., "'I know what went on between you and Charlie, and I just decided to forgive you and move on.'"

When A.C. was 18 years old, she encountered defendant when she was at a car dealership trying to buy a car. The salesperson was defendant's cousin, and he recognized A.C. as defendant's daughter. A.C. acknowledged she had lived with defendant a few years before. When A.C. could not qualify for a car loan without a cosigner, the salesperson suggested she ask defendant to cosign for her. At A.C's request, defendant came to the dealership, but he refused to cosign for the loan. A.C. denied going back to the dealership multiple times.

### E. A.C. Reports Defendant's Conduct to the Police in 2016

In February 2016, when A.C. was 20 years old, she contacted the Madera Police Department to report her relationship with defendant. A.C. told Detective Brent Cederquist that she had sexual intercourse and oral sex with defendant more than a 100 times over a two- or three-year time frame. She told Cederquist she had refused to give the police a statement in 2010 because she loved defendant then and she did not want him to get into trouble.

#### 1. Pretext Phone Calls and Text Messages

Cederquist arranged with A.C. to conduct two pretext phone calls with defendant on a department-issued cellphone. Both phone calls were recorded, and Cederquist was

present for each. The first pretextual call was made on February 23, 2016. Over the phone, A.C. told defendant her counselor had advised her to talk with people who had hurt her in the past. She asked him why they had had sex; defendant refused to discuss it over the phone:

> "[A.C.]: Okay. So if you love me than—then help me out and help me get through this and move on and just tell me why did we have sex. Like, why did we do that? Why?
>
> "DEFENDANT: Yeah. Yeah. But the thing is, [A.C.], I—I can't talk on the phone. I just can't."

A.C. reiterated her desire to talk about it over the phone; defendant said he was not comfortable speaking over the phone, but said he still loved and cared about her. A.C. then offered to communicate over text message, and defendant agreed.

After A.C. left the police station that day, Cederquist impersonated A.C. and contacted defendant by text message using the same department-issued cellphone. He documented the text message and created a transcript of it. Cederquist, as A.C., asked defendant to meet because A.C. was trying to "'get past this.'" Defendant responded that he was sorry and wished that all could be forgotten because A.C. deserved to have a "'full, rich life.'" He hoped she could "'find it in her heart'" to "'forgive'" so that she could "'move on'" and "'reach [her] full potential in life.'"

On March 3, 2016, Cederquist met with A.C. again to conduct a second pretextual phone call with defendant using the same department-issued cellphone. A.C. told defendant she wanted to talk about the feelings she had for him now that she was an adult, and that she had not realized she would fall in love with him when they were having sex when she was a child. She asked why they had sex, but defendant refused to talk about it on the phone. When A.C. questioned why he could not discuss the issue over the phone, defendant said he would rather apologize in person. When A.C. asked

17.

specifically what he was sorry about, he said he was sorry for all the hardship she had gone through and that he wanted her to forgive him "for not being there for [her]."

On the same day of the call, Cederquist again impersonated A.C. and texted defendant on the same phone. Cederquist wrote, "'You made me [fall] in love with you. I still think about how we made love, but now it's like it didn't matter.'" Defendant responded, "'No! I'll always love you forever because you matter to me.'" He also said, "'Sorry for your pain … please forgive me.'" Cederquist then asked, "'Tell me … did you love me or use me?'" and defendant responded, "'Love you.'" Cederquist texted back, "'Thank you. That means more than you know.'" Defendant responded "'I'm here all [*sic*] for you,'" and Cederquist wrote, ""I still have feelings.'" Defendant asked, "'In what way?'" Then defendant texted that "'We will always have feelings toward each other.'" Defendant again texted that he could not talk about it over the phone, and that ""[i]t's always been a problem with me because you just never know who might be listening.'" Defendant then agreed to meet A.C., but Cederquist wrote back that he was not going to text defendant anymore.

### 2. Interview With Defendant

On March 8, 2016, Cederquist interviewed defendant, who acknowledged he had recently received communication from A.C. Cederquist indicated to defendant he was looking into A.C.'s communications on Facebook with someone named Charlie Falcon and messages between the two about having sex and missing each other. Defendant mentioned that he went by the name Charlie Falcon, but did not recall whether he had a Facebook account under that name. Cederquist never personally investigated what occurred on Facebook as six years had passed and obtaining those records would be difficult. Although Cederquist looked into it, he could find no record that Dawn gave the Facebook records to the sheriff's department when she contacted them in 2010.

### 3. Forensic Analysis of Defendant's Cellphone

Cederquist undertook a forensic analysis of defendant's cellphone. The forensic report showed the phone number for Cederquist's department-issued cellphone that had been used for the pretext calls and texts. Cederquist also saw evidence of the pretextual calls in the call log, but the text messages did not show up in the forensic report. Cederquist opined this was because they were overwritten by other texts in the cellphone's flash memory; Cederquist acknowledged he should have saved or taken photos of the text messages on the department phone when the conversations occurred.

## II. Defense Case

### A. Defendant's Testimony

Defendant testified on his own behalf and denied engaging in any sort of sexual conduct with A.C. He made specific denials he had ever given her signals to engage in sexual activity. He and L. took A.C. into their home because their daughter cared about her, and they wanted to help A.C. She adapted well into the family, so they had considered adopting her. The adoption specialist, Bean, told them that A.C. had made prior allegations of sexual misconduct against a foster parent, so defendant was never alone with A.C.

Physically, defendant explained he is diabetic and is incapable of having multiple erections in a single sexual encounter, and it is not easy for him to become sexually stimulated; he is circumcised. He also claimed it was not possible to have sex in the laundry room as A.C. described because the doors were always propped open with a laundry basket. He indicated the cab of his truck was too small to engage in the sex acts A.C. described, and he denied ever having sex with A.C. on the living room sofa. Defendant pointed out that both of his daughters were light sleepers, and that A.C. slept on the top bunk of a wooden bunk bed that creaked.

Prior to taking a job in Sacramento in 2009, defendant took odd jobs through a temporary service, but he never took his children on those jobs. He started working in Sacramento in late June or early July 2009.

On the day A.C. left the Cortez home, defendant was working in the garage when S. ran in to tell him that A.C. had struck L. Defendant went into the house and asked L. if she was alright, and noticed that the front door was cracked open. Defendant went outside to search for A.C., and L. called CPS.

After A.C. was placed in a new foster home, she continued to call defendant frequently because she wanted to come back and be part of the family; defendant told her that was impossible because she had struck L. Defendant also contacted A.C.'s social worker to tell her that A.C. would not stop contacting him.

Defendant recounted the circumstances of A.C. jumping from his truck. He explained that A.C. had called him to ask if he and L. could pick her up because she had gotten high on drugs. Defendant and L. went to pick her up, and because the Hilterbrands were not home, they took A.C. back to their house, where A.C. stayed overnight. The next morning, A.C. told them she was supposed to meet the Hilterbrands at church, so defendant proceeded to drive her there. On the way, defendant lectured A.C. about her drug use; A.C. said she wanted to come back to the Cortez house, but defendant told her she could not. A.C. said she hated her life and then jumped out of the vehicle. Defendant had managed to slow the vehicle before she jumped, but she was hurt anyway and he took her to the hospital.

Defendant denied ever giving A.C. a ring or telling her he was burying the ring along with his heart. The last time defendant had seen A.C. was at the car dealership—he had gotten a call from someone who told him his daughter was there trying to buy a car and asked him to come down. When defendant got to the dealership, Eddie Falcon came up to him and said defendant's daughter needed a cosigner. Defendant saw that A.C. was there with two other men, and defendant told Falcon he would not cosign for the car loan.

20.

When defendant tried to leave the dealership, A.C. followed him and tried to convince him to cosign. When he refused, A.C. became angry and threatened to make accusations against him if he did not give her a car within a week. A.C. kept calling him over the course of the week, but defendant did not answer the calls.

Defendant admitted he engaged in the pretextual calls and texts. He expressed surprise that A.C. was calling him after three years, but he had not wanted to talk to her and was trying to end the call. He ignored her accusation they had had sex because it was not true, and he did not want to engage with her as she often called him and rambled. He had saved her phone number under "AC" for "'avoid call.'" He had answered A.C.'s call on March 3, 2016, because he was using a Bluetooth device and it automatically answered before he realized who was calling. He tried to end the call and ignored her accusations about a sexual relationship because he had no idea what she was talking about. He told her he loved her like a daughter, and apologized because he had failed to protect her from herself.

### B. L.'s Testimony

L. testified on defendant's behalf. At the time of trial, she and defendant had been married 28 years. She explained how she and defendant became foster parents to A.C, and she described the layout of the house when A.C. came to live with them. At that time, everyone in the family went to bed between 9:30 and 10:00 p.m. A.C. slept on the top of the bunk bed in S.'s room, which was "very creaky" when A.C. climbed in and out. S. was a light sleeper, and T. slept with her door open. T.'s room was right next to the living room.

A.C. was involved in numerous sports and plays at school, and was engaged with S. in a "fake baby" project where they had a robotic doll that would cry to be fed or changed at various times; the project lasted one or two weeks, and L. often heard the baby cry in the middle of the night during this time.

21.

The family went to church twice a week. Defendant never stayed home with any of the children while everyone else went to church. The family was generally all together in the evenings. When A.C. first arrived at the house, she was shy, but later became rebellious and "wordy" when told what to do. A.C. liked to wear tight, low-cut clothes that L. would not permit. L. treated the girls the same and did not let either A.C. or S. wear makeup. A.C.'s rebelliousness caused a lot of tension in the house.

In April 2009, defendant took a job in Sacramento that lasted through the date A.C. moved out in January 2010. During this time, defendant would leave the house at 5:00 a.m. on Monday and would not return until 5:00 or 6:00 p.m. on Friday evening, or Saturday morning. He was never home during the week and never took A.C. with him to Sacramento.

When A.C. lived with them, L. never heard any sexual noises emanating from any room in the house, including the laundry room. She explained that between 2007 and 2010, defendant was unable to have sexual intercourse on a daily basis—since 2007, his erections had become softer than when they were married, and he had more trouble ejaculating.

A.C. ultimately left their home after A.C. punched L. in the face after they had an argument about a boy. L. denied the argument was based on any envy of A.C., and denied suspecting defendant had a sexual relationship with A.C. She denied she ever found A.C. sleeping on the couch with defendant. After A.C. left the house, defendant would frequently receive calls or voicemails from A.C. that would appear to frustrate defendant.

L. had three contacts with A.C. after January 2010. The first was when defendant told L. A.C. needed to be picked up, so she and defendant went to get A.C. L. tried to call Dawn Hilterbrand, but did not get an answer, so they took A.C. back to their house while they waited for a call back. While they were waiting, they lectured A.C. on her behavior. When Dawn did not return their call, they returned A.C. to her friend's house.

22.

Defendant never acted in an embarrassed or evasive manner when they transported A.C. that day.

A few weeks after that encounter, A.C. called defendant and someone dropped A.C. off at their house. They again lectured her about her behavior, and then defendant drove her back to the Hilterbrands. Defendant later called L. to tell her A.C. had jumped out of the vehicle, and L. went to the hospital, where she stayed with A.C., who she still considered as her daughter. She never suspected defendant and A.C. had a sexual relationship, and she denied they argued about it on the day A.C. went to the hospital.

In a final encounter, L. came home from the store to find A.C. in her driveway with a boy. A.C. wanted the Cortez's dog, but L. told her she could not have it; they argued, and L. told her to leave. A.C. continued to argue until L. threatened to call the police and went inside, and A.C. then left without the dog. At some time later, A.C. returned with the boy and two adults, and aggressively demanded the dog. L. gave them the dog "just to be finished with it," and she denied saying anything to A.C. about her having a sexual relationship with defendant or forgiving A.C.

### C.   T.'s Testimony

T., defendant's daughter, also testified on defendant's behalf. She explained that when A.C. lived with the Cortez family, A.C. had a lot of extracurricular activities, including soccer, which T. coached. The weekday family schedule after school or practice included having dinner together as a family, watching television, and then going to bed about 9:30 or 10:00 p.m. T. slept with her bedroom door open, and her bedroom was right next to the living room. A.C. slept in S.'s room on the top of a bunk bed that was wooden and creaky and would make noise whenever someone climbed in or out of it. T. was a light sleeper, and T. would wake up when people got up at night to use the bathroom. T. never saw defendant or A.C. sneak past her door at night.

The washer in the laundry room made a clunk sound when it was pressed on, and T. never heard any sounds of a sexual nature coming from the laundry room or the living room between 2007 and 2010.

T. remembered their mother going on church retreats during the time A.C. lived with them, leaving the girls home together with defendant, but T. never remembered A.C. being alone with defendant. When they went to church, they would go together unless defendant was not done with work, and then he would arrive separately; there was never a time A.C. and defendant would arrive to church together, separate from the family.

L. tried to remain fair when T. or S. had a fight with A.C. T. said A.C. dressed inappropriately for a 13-year-old, which conflicted with the style of dress deemed acceptable in the household. A.C. would throw fits and tantrums if she were told to wear more modest clothing. A.C. would confide in T., but she never told T. that she was in love with defendant. T. said she could not remember defendant being jealous of any boys that came around.

On the day A.C. came to retrieve her dog, she was with her boyfriend, her eyes were red, and she smelled like something. T. asked her if she was high on drugs, and A.C. told her, "'Yeah, I can do what I want, …. You guys [are] not in charge of me.'" A.C. said she just wanted her dog. T. told L., who handed over the dog. T. never heard L. say she forgave A.C. for anything.

**D. Edward Falcon**

Defendant's cousin, Edward Falcon, worked at a car dealership in 2012 when A.C. came into the dealership with two men. The men bought a car, and A.C. wanted one also, but when she completed the application it was apparent she would not qualify without a cosigner. A.C. came back to the dealership over the course of the next week trying to persuade Falcon to cosign for her or to find alternative financing. One day, she told Falcon that her stepdad could sign for her, so Falcon told her to have her stepdad come in

24.

to fill out the application. One Saturday, A.C. showed up and said her stepdad was coming to the dealership, and later defendant showed up.

Recognizing his cousin, Falcon was surprised to see defendant, and asked if he was going to cosign; defendant indicated his wife would not let him. Upon defendant's refusal to cosign, A.C. became upset and, at some point, she told Falcon's manager he had been harassing her, and Falcon was subject to a disciplinary write-up.

### E. Mike Hogan

Mike Hogan worked with defendant between 2009 and 2011 in Sacramento County, five days a week, Monday through Friday. The company provided housing for the workers during the week, and Hogan stayed in the same house as defendant. On Monday mornings, workers would meet and carpool to Sacramento in company vans. Initially, workers drove their own cars to and from Sacramento, but by June 2009 the company provided vans for workers to carpool during the week. Hogan never recalled defendant being away from Sacramento during the workweek. Hogan had seen L. at the company house in Sacramento County once, but he was unaware whether any children accompanied her.

## III. Prosecution Rebuttal Case

Falcon's manager from the car dealership testified that Falcon's personnel file contained a write-up after A.C. had complained she had received an excessive number of calls from Falcon.

Bean, the adoption specialist, testified L. told her she felt uncomfortable because defendant showed favoritism to A.C. when there were disagreements in the household. To her knowledge, Bean had not told defendant or L. that A.C. had alleged a former foster parent had abused her. She acknowledged she would have reviewed with prospective foster parents any issue a minor might have in the interests of full disclosure, but she could not remember everything she had discussed with defendant and L.

25.

A.C. testified defendant had told her he did not have frequent sex with his wife because his wife felt it was "gross because she was kind of religious, and she felt like having sex was only [for procreation], and that's it." As to his sexual relationship with A.C., defendant told A.C. he pursued that because he loved her.

Detective Cederquist testified Dawn had communicated with someone named Charlie Falcon on Facebook, and while defendant said that was his name, he also said he could not recall if he had a Facebook account in that name in 2010. Although defendant had family members with the last name "Falcon," and it was not uncommon in the Hispanic culture to use more than one last name, Cederquist found no evidence connecting defendant with the name Charlie Falcon.

## IV.        Defense Surrebuttal Case

L. testified that before A.C. moved in with the Cortez family, Bean initiated a discussion with them about A.C. having engaged in sexual conduct with a previous foster parent.

## V.        Jury Deliberations and Verdict

During deliberations, the jury asked for a readback of A.C.'s testimony. The jury later indicated they were unable to reach a verdict on counts 5 and 6, and the trial court instructed them to continue their deliberations. After further deliberation, the jury informed the court they were hopelessly deadlocked on those two counts. The court thereafter declared a mistrial as to counts 5 and 6, and the counts were later dismissed.

The jury found defendant not guilty of six counts of lewd or lascivious acts upon a child under the age of 14 years old by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (counts 1, 2, 3, 4, 7 & 8; § 288, subd. (b)(1)). As to each of those six counts, however, the jury found defendant guilty of the lesser included crime of committing a lewd or lascivious act upon a child under the age of 14 years old. (§ 288, subd. (a).)

## DISCUSSION

### I.  Exclusion of Witness Testimony:  Background

The trial court sustained the prosecutor's relevance objection when defense counsel asked T. whether A.C. brought "boys around" while living at the Cortez house, which defendant claims was prejudicial error.

A.C. testified at times defendant would become irritated with her and would tell A.C. he was going to have sex with his wife rather than A.C. because he did not like the way A.C. had been acting that day.  On another occasion, when defendant saw A.C. talking to this boy at school, defendant gave A.C. "dirty looks," and A.C. said she knew that meant he was "mad" at her.  Other than this boy, A.C. could not remember if defendant showed any other signs of disapproving of people A.C. liked.  A.C. also testified that defendant gave her a ring after A.C. moved out of the Cortez house, that he was planning to marry her when she turned 18, and that he did not want her to have any other boyfriends.

When Dawn testified, she characterized defendant's behavior toward A.C. as more like a jealous boyfriend than that of a father.  Dawn had been asking questions of A.C. about her relationship with defendant because Dawn felt that something about it just did not "feel right."  Dawn explained defendant seemed to act with what Dawn characterized as "almost—there was jealousy, like, boyfriend-girlfriend jealousy."  Dawn was specifically "clued" into this jealousy when A.C. went on an overnight visit with her biological mother.  Defendant called Dawn to tell her A.C and he had argued over the phone, A.C. was going to meet a boy at a park, and defendant did not think that was "okay."  Dawn explained to defendant that A.C. is 15 years old, and "a teenager seeing a boy is not out of the question."  After Dawn could not reach A.C. by phone, she drove to A.C. and asked if she was meeting a boy.  A.C. said she was not, she only said that to defendant to make him upset.  Dawn thought it was not normal and wondered why a

27.

person would "tell someone who you think of as a father something to get them upset about a boy[.]"

Marcus also described his sense that the relationship between A.C. and defendant "felt much more like a jealous boyfriend-type relationship than it did a parent or a guardian type relationship with a young child." He explained that over the course of A.C. living in their house, A.C.'s relationship with defendant struck Marcus and Dawn as awkward, as though something just was not right. Marcus elaborated that "when [A.C. and defendant] would get off the phone, and [A.C.] would just be devastated and crying, … and that he kept calling and even when I would tell him, you know, 'We need some space. This is inappropriate,' that constant calling felt very weird. And, like, it was crossing a line when we've asked [defendant] to stop calling … I believe the social workers had asked [defendant] to stop. I know [defendant's] wife had not been happy with the calling. And just not having that line, it felt much more like a jealous boyfriend-type relationship than it did a parent or a guardian type relationship with a young child."

Defense counsel asked T. about instances of jealousy defendant may have exhibited, as follows:

> "[DEFENSE COUNSEL:] Did [A.C.] confide with you about relationships about being in love with [defendant]?
>
> "[T.:] No.
>
> "[DEFENSE COUNSEL:] Did your—do you remember your father being jealous about any boys that came around?
>
> "[T.:] No.
>
> "[DEFENSE COUNSEL:] Did [A.C.] bring any boys around?
>
> "[PROSECUTOR]: Objection. Relevance.
>
> "THE COURT: Sustained.
>
> "[DEFENSE COUNSEL:] Do you remember your father acting weird because your—because [A.C.] brought a boy around?

28.

"[T.:] No.

"[PROSECUTOR]: Objection. Vague.

"THE COURT: Sustained.

"[PROSECUTOR]: Move to strike.

"THE COURT: The answer's stricken."

Defendant argues T.'s excluded testimony that A.C. brought boys around was directly relevant to impeach A.C.'s credibility in testifying that defendant acted like a jealous boyfriend, and to rebut the corroborating testimony of the Hilterbrands that defendant seemed more like a jealous boyfriend than the typical father figure. Defendant contends this portion of T.'s testimony was of such critical importance that its exclusion violated his constitutional rights to due process, to present a complete defense, and to a fair trial. Specifically, defendant contends A.C.'s credibility was the key issue at trial and that T.'s excluded testimony was elicited to directly rebut A.C.'s testimony and impeach her.

## II. Analysis

### A. Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence for abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; *People v. DeHoyos* (2013) 57 Cal.4th 79, 131.) "Under the abuse of discretion standard, 'trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) "'[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 39.)

## B.    No Error

Defendant argues T.'s excluded testimony was elicited to directly rebut A.C.'s testimony and impeach her credibility, which was central to the case.  It was also important to contradict the Hilterbrands' characterization of defendant that he seemed like a jealous boyfriend.  The single piece of T.'s testimony that was allowed by the court as to defendant's jealousy (that defendant was never jealous when any boys came around) was insufficient by itself to give the proper context and establish the probative value of T.'s testimony about defendant's conduct around boys.  Defendant maintains the error was so critical to his defense theory, the exclusion of T.'s answer amounted to a violation of his constitutional rights.[4]

We disagree with defendant that the exclusion of T.'s testimony about whether A.C. brought "any boys around" was erroneous, even to the extent it was meant only to clarify the prior testimony that defendant did not act jealously about any boys who "came around."  Defendant characterizes T.'s answer to this single question as highly relevant and significant evidence to contradict A.C. and the Hilterbrands' testimony defendant acted like a jealous boyfriend.  Yet, A.C. and Dawn testified to defendant acting jealously regarding another boy in only two specific instances, neither of which were witnessed by T. or involved boys A.C. "brought … around" to the Cortez house or anywhere else.  T.'s testimony in this regard was not relevant to impeach either Dawn or A.C. about the two specific instances of defendant's jealous behavior they described.

Defendant argues the excluded testimony about whether A.C. brought boys around was necessary to fully and clearly articulate that T. never saw defendant act jealously with any boy who was specifically with A.C., which was relevant to contradict the Hilterbrands' general characterization of defendant as acting more like a jealous

---

[4]    The defense also asked whether defendant acted "weird because … [A.C.] brought a boy around," and the court sustained the prosecutor's objection to the question as vague.  Defendant presents no argument this ruling was error.

30.

boyfriend than a father figure. However, T.'s testimony that defendant did not act jealously about "any boys that came around[]" was admitted. The follow-up question whether A.C. in particular brought "any boys around[]" added next to nothing, particularly in context. T.'s first answer that she did not remember defendant being jealous of *any* boy who came around was broad and necessarily included any boys who were around because of A.C. Moreover, it was clear in context that the question about defendant's jealousy was in direct relationship to A.C. The prior question asked by defense counsel was whether A.C. confided in T. that A.C. was in love with defendant, to which T. answered no. The immediate follow-up question was whether T. remembered her father being jealous about any boys that came around. Within that context, there was very little likelihood the jury could have misunderstood that T. never saw defendant act jealously as to any boys, including those who were with A.C.

Even if we assume, arguendo, the exclusion of this portion of T.'s testimony was erroneous, that error would not be of constitutional magnitude as "the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.) Here, excluding one answer to a question that merely reiterated what T. had already stated about not witnessing defendant being jealous of any boys that came around was not tantamount to a complete preclusion of defendant's defense, nor did it interfere with defendant's right to a fair trial. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4 ["[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense."].)

Nothing precluded defendant from asking different questions to elicit further testimony about defendant's behavior when other boys were around A.C. Defense counsel attempted to ask whether defendant had ever acted "weird" because A.C. "brought a boy around," and while the court sustained the prosecutor's objection to that question as vague, defense counsel did not rephrase the question or ask more specific

questions about how defendant acted around any boys who were with A.C. The court did not preclude defendant from asking questions about any jealousy or unfatherly behavior T. may have witnessed from defendant regarding A.C. (*People v. Jones, supra,* 57 Cal.4th at p. 957 ["[B]ecause the trial court merely excluded some evidence that could have impeached a complaining witness and did not preclude [the] defendant from presenting a defense, any error would be one of state evidentiary law only."].)

### C.     Any Error Was Harmless

Though we conclude there was no error of either state or federal law in excluding one portion of T.'s testimony, even if we assume the exclusion of this testimony was erroneous and applied the stricter *Chapman* harmless error analysis, we are convinced beyond a reasonable doubt defendant suffered no prejudice from the exclusion of T.'s answer to a single question. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Under the *Chapman* analysis, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt[,]" and did not contribute to the verdict. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.)

Defendant maintains there was significant evidence in his favor, and the question of his guilt pivoted on A.C.'s credibility, which T.'s excluded testimony would have impacted. Defendant notes the frequency of the sexual encounters A.C. testified to were inconsistent with defendant's erectile dysfunction, they involved locations and times where the risk of discovery was unrealistically high, and some of the locations where she claimed the sexual intercourse occurred were too small to accommodate the act. A.C. also claimed to have had sex all hours of the day and night, which was incompatible with A.C.'s ability to maintain excellent grades, her school schedule and multiple extracurricular activities; A.C. could not recall whether defendant was circumcised, even though she claimed frequent sexual contact with him; and there was also evidence she had alleged sexual misconduct against another former foster parent.

Moreover, defendant claims, A.C.'s credibility was doubted by the jury, making it even more likely the excluded testimony affected the verdict. Defendant points out the jury asked for a readback of A.C.'s testimony, they found defendant not guilty of the greater charged offense, which involved the use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury, and they could not reach a verdict on counts 5 and 6.

It is clear the jury did not credit all of A.C.'s testimony, particularly her statement that no more than two months ever elapsed without A.C. and defendant having sex while she lived at the Cortez house. The jury could not reach any verdict on counts 5 and 6, which each charged a lewd or lascivious act by means of force, duress, violence, menace, or fear of immediate injury by defendant upon A.C. between January 1, 2009, and June 30, 2009. There was evidence that in 2009 defendant worked away from home in Sacramento on the weekdays, and that he was home only on weekends. Yet, the jury still convicted defendant of two counts of lewd or lascivious conduct upon A.C. between July 1, 2009, and August 13, 2009. So, while the jury may have questioned the frequency of the sexual acts as A.C. testified, the jury obviously credited A.C.'s testimony that repeated sexual acts occurred while she was living at the Cortez home.

And, although the jury did not convict defendant on the greater offense of lewd or lascivious conduct upon A.C. by means of force, duress, violence, menace, or fear of immediate injury, A.C. did not testify to any acts by defendant that involved force, violence, menace, or fear of immediate injury. The only specific act A.C. described that arguably involved duress was when defendant told her to show him how grateful she was that he had taken her into his home, and that instance did not culminate in a lewd or lascivious act.[5] The jury's refusal to convict of the greater offense did not reflect on

---

[5] That is not to say duress could not have been inferred under the circumstances given the power differential between A.C. as a foster child and defendant as her adult guardian. In any event, the jury did not make that inference.

33.

jury's view of A.C.'s credibility.  Further, it is difficult to draw specific inferences about why the jury requested a readback of A.C.'s testimony.

However, even to the extent the jury doubted A.C.'s overall credibility, the exclusion of T.'s testimony had no bearing on the outcome.  Defendant's lack of jealousy around boys who "came around[]" was already admitted into evidence.  The jury heard that testimony and, in context, they would have understood  defendant's lack of jealousy extended to boys with whom A.C. associated and "brought … around."  Further, even if the jury somehow needed the clarification that boys who "came around[]" included boys A.C. brought to the house, that testimony bore little relationship to A.C.'s credibility or the Hilterbrands' characterization of defendant as acting more like a jealous boyfriend than a father figure.  A.C. testified that, other than the one boy who defendant saw her with at school, she could remember no other jealousy exhibited by defendant around boys with whom A.C. associated.  In that regard, A.C.'s testimony was actually consistent with T.'s testimony she did not remember defendant acting jealously about any of the boys who "came around[]" the house.

The significant impact of the Hilterbrands' testimony was not their general characterization of defendant as seeming more like a jealous boyfriend than a father figure, it was the months of interactions and behavior they witnessed and testified to that strongly indicated an illicit relationship between A.C. and defendant and corroborated A.C.'s testimony.  Those events and observations did not center on jealousy; they included excessive amounts of phone calls between A.C. and defendant, the Hilterbrands' own interactions with defendant that seemed to them inappropriate for a father figure, the way A.C. reacted to defendant's phone calls and texts, defendant's inability or unwillingness to stop contacting A.C. despite direct requests from social workers and the Hilterbrands to do so, defendant's wife's apparent upset over the continued contact, the volume and substance of the messages Dawn intercepted between A.C. and defendant, Dawn's interaction with someone on Facebook she deemed from context was defendant,

and A.C.'s confession of the relationship to the Hilterbrands in 2010. The conduct described by the Hilterbrands, of which only a single instance involved jealous behavior by defendant, was strong corroboration of A.C.'s testimony.

Beyond that, the pretextual phone calls and text messages also strongly supported A.C.'s testimony about the sexual relationship with defendant. While defendant did not expressly admit during those pretextual calls and texts that he had a sexual relationship with A.C. while she lived at the Cortez home, he did not deny A.C.'s statements they had had a sexual relationship when she was a child living at his house.

There were additional pieces of evidence that supported A.C.'s testimony, including testimony of a social worker, Otilia Zaragoza, who noted there was something about the relationship between A.C. and defendant that concerned her and "didn't seem right" when she saw them together at the hospital after A.C. jumped out of defendant's car. When another social worker, Leal, questioned A.C. about the sexual nature of the relationship in September 2010, A.C. did not deny it though she refused to discuss it. And, although A.C. appeared to do well in school and participated in extracurricular activities, there were well-documented instances that A.C. suffered from panic attacks while she lived at the Cortez home that continued to occur while she lived with the Hilterbrands, creating an inference there was anxiety about something in her life. All of this lent support and corroboration to A.C.'s testimony.

In sum, T.'s excluded testimony did not in any way erode the strength of the evidence that corroborated A.C.'s testimony about the sexual relationship with defendant. The fact the jury refused to credit much of the evidence favorable to defendant that contradicted A.C.'s version of events speaks to the strength of the evidence supporting A.C.'s testimony, even if the jury may have questioned A.C.'s credibility in certain regards. Moreover, as already noted, T.'s excluded testimony was redundant of what was already before the jury, and it did not impeach A.C. It also did not contradict the Hilterbrands' characterization of defendant because that was not based on conduct T.

35.

witnessed, nor did it have anything to do with how defendant acted when A.C. brought boys around, other than a single event.  Beyond any doubt, there is no reasonable possibility the exclusion of T.'s testimony about whether A.C. "brought boys around" contributed to the verdict.

## DISPOSITION

The judgment is affirmed.


MEEHAN, Acting P.J.

WE CONCUR:


SNAUFFER, J.


DeSANTOS, J.

36.